# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| EVAN DOMANIC, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO.: 4:22−cv−00386 |
| | § | |
| CHRISTIAN BROTHERS | § | |
| AUTOMOTIVE CORPORATION, | § | |
| | § | |
| **Defendant.** | § | |

## DECLARATION OF BRAD FINK

COMES NOW Brad Fink, who declares and testifies as follows:

1.     "My name is Brad Fink ("Declarant"). I am fully competent and qualified to make this Declaration ("Declaration").

2.     "I am employed by Christian Brothers Automotive Corporation ("Christian Brothers" or "Company") with the current job title of Chief Growth Officer effective December 15, 2022. Prior to that, and in 2020 and 2021, my title was Vice President of Training & Franchise Development.

3.     "I have personal knowledge of the facts stated in this Declaration. I am authorized by Christian Brothers Automotive Corporation to make this Declaration in the capacities indicated. All facts set forth in this Declaration are true and correct.

### Exhibit B Attached Business Records

4.     "With respect to the lawsuit brought by Evan Domanic against Christian Brothers, I am the custodian of certain Christian Brothers business records related thereto, including true and correct copies of original records attached as Exhibit B with this Declaration to the Appendix to Defendant's Final Motion for Summary Judgment ("Appendix"), which are identified by Bates Numbers used in discovery and document production in this case and the following new Bates numbers: MSJ-001 – MSJ-084. The records are referenced in this Declaration in the following format: "Ex.B:000" for a single document, with "000" referring to the Bates number, or "Ex.B:000-001" referring to a range of documents by Bates number.

5.     "Each of the documents included in Exhibit B identified above and which are attached to the Appendix with this Declaration constitute business records maintained by Christian Brothers in the regular course of its business.  It was in the regular course of business of Christian

Declaration of Brad Fink          DEFENDANT'S EXHIBIT A          1

Brothers for an employee or representative of Christian Brothers, with knowledge of the act, event, or condition recorded to make or receive and keep each record or to transmit information thereof to be included in each such record, such that each record was received or made at or near the time of the act, event, or condition recorded, or reasonably soon thereafter as applicable.

### Relevant Time Period

6.      I am aware that the allegations in the lawsuit brought by Evan Domanic ("Plaintiff") related to events starting September 28, 2020 and occurring primarily in October and November 2020. See Ex.B:22-53. My statements in this Declaration are intended to relate to conditions in effect during that time period unless indicated otherwise.

### Christian Brothers Automotive is a Chrisitan Faith-Based Business

7.      Christian Brothers Automotive Corporation is a Christian faith-based, for-profit corporation and the franchisor of the Christian Brothers Automotive brand. There are presently almost 300 Christian Brothers stores located in 30 states in the United States. Christian Brothers Automotive stores are independently owned and operated by Franchisees.

8.      Christian Brothers has set out to implement a standard of service unparalleled by its competition, and to change the way our guests think about auto service by providing knowledgeable, honest, and genuine car repairs. Christian Brothers is proud to have won the JD Power and Associates award for #1 in Customer Satisfaction in our class for the last five consecutive years.

9.      The Company expresses it Christian faith-based mission in a variety of ways, including in its name. It maintains a website which reflects many of the Company's different expressions of its Christian faith-based culture and mission. Some examples are found in Ex. B and are discussed in the following paragraphs. All of the items discussed in paragraphs 10 – 22 were available on the Company's website or online in 2020 and as indicated many of them were sent by email to Plaintiff according to Company business records.

10.     Ex.B:25-35 is the "**Brand Review**" brochure sent to prospects after the Step 1 phone call. See 10/21/2020 email sending it to Plaintiff. Ex.B:24. It is used as an outline during the Step 2 phone call by the franchise development team (including Brandon Thomas) to walk prospects through an overview of information about the Company's approach to franchising. The brochure's p.4 explains the Company's "Key Franchise Differentiators" with **"Difference #1"** **being that the Company is "Faith based."** Ex.B:28.

11.     Ex.B:37-40 is the "**Request for Consideration**" form. It is a questionnaire sent to the prospect (including Plaintiff) after the Step 2 phone call. See 10/27/2020 email sending it to Plaintiff, Ex.B:36. At Ex.B:40 it asks the prospect to react to the Christian Brothers Automotive Mission Statement: **"We seek to glorify God by providing ethical and excellent automotive repair service for our customers."**

Declaration of Brad Fink          DEFENDANT'S EXHIBIT A                              2

12. Ex.B:43-53 are blank forms authorizing a "Universal Background Screening" and a "Personal Financial Statement" and disclosure forms routinely sent to prospects (including Plaintiff) immediately after the third phone call at Step 3. See 11/05/2020 email sending it to Plaintiff. Ex.B:41-42.

13. Ex.B:02 is from the Company's website which informs readers that **"Our Mission Is Simple: Love Your Neighbor As Yourself."** Additional copy states that "We approach car repair services with a commitment to loving our neighbors." "Love Your Neighbor As Yourself. That's our mission with every customer we serve."

14. Ex.B:03 is from the Company's website which informs readers of **"Love Your Neighbor As Yourself—Matthew 22:39."** "Our Guiding Idea: Love Your Neighbor As Yourself." "No passage sums up our approach to customer service better than this one: Love Your Neighbor As Yourself."

15. Ex.B:04-07 is from the Company's website and introduces Mark Carr, the Company's founder: "He had one simple but powerful mission for his company – love your neighbor as yourself. After 30 years, this principle remains the heart of every store, every franchisee and every employee." **"Mark believes the success of the company and the success of the franchisees will only continue through a strong connection to faith."**

16. Ex.B:05 is from the Company's website and recounts the Company's history: **"Mark prayed and asked God to provide him a business.** The very next day, while Mark was attending a Sunday school function through Spring Branch Bible Church, a gentleman from his class walked up, said that he was an automotive technician, and asked Mark to help him start an automotive repair shop. The two men didn't know what to call their new venture. **They were encouraged by their Sunday school class to call it Christian Brothers Automotive, as they were two brothers in Christ."**

17. Ex.B:06 is from the Company's website and continues to recount the Company's history by pointing out **"two of Christian Brothers Automotive's clear value propositions to the customer: having the owner of the business on site, building relationships"** and "ensuring that the owner can relate to the customers and serve them the way the owner would want to be served." This page also explains the Company's success and expansion: when "the Company started offering its franchise throughout Texas. **Many of Christian Brothers' earliest franchisees arrived through Mark's Sunday school class** at Spring Branch Bible Church. These families and their relatives opened the original seven Christian Brothers locations…"

18. Ex.B:08 is from the Company's website and explains several faith-based distinctives, by first declaring that Christian Brothers is a **"Business-Focused Company Applying Strong Biblical Principles To The Auto Repair Industry"** such as allowing franchisees "to close their shops on Saturdays and Sundays, giving their employees the critical time off they need to spend time with family" and offering a testimonial that "It's not God over there and job over here. God is in everything. I appreciate being able to go into a business where that is embraced." All of which is said to be **"Instilling faith and principles in an industry few trust."**

19.    Ex.B:08 is from the Company's website and describes how "every fall, we do a single moms oil change day. We work with local churches to find people who need it. We don't advertise it… this is something people love. That kind of heart, that kind of mindset, separates us from our competitors."

20.    Ex.B:09-14 is from the Company's website and is but one of the many testimonials, this one is titled "Auto Repair Franchise Review: **Fellowship Among Franchisees, Mission Set Christian Brothers Apart."** In answering the question "What sets Christian Brothers apart?" the franchisee said **"We are followers of Christ, and we honor him by providing great service**, and that sets the tone for who we are and what we do… I give away free Bibles on my counter… Once they get to know us and see the way we treat them, they begin to understand. We are committed to service, not just to accomplish our business goals, but also because we feel like we're answering to our savior in everything that we do." "With the kind of people Christian Brothers accepts into the system, what we believe comes through to our customers. I enjoy… getting to know them. We want long-term relationships with customers…"

21.    Ex.B:15-16 is from the Company's website and describes "What we look for in potential Christian Brothers franchisees" and explains that the key to the Company's "remarkable success is because we teamed up with franchisees who are passionate not about auto repair or car culture, but about making a positive impact in people's lives." To build on that success, the page explains "some of the key characteristics we're looking for." The first is that **"We are looking for franchise team members who have made their faith a central part of their lives. The teachings of Christ have informed how we do business for more than 40 years** and we continue to take an approach towards customer service that honors his instructions to love your neighbor as yourself."

22.    Ex.B:21 is from the Company's website and explains the "Nice Difference" motto: "Car repairs have become synonymous with aggressive mechanics, cramped lounges and waiting in discomfort. At Christian Brothers we actively dispel such stereotypes… **Our business is grounded in what Matthew 22:39 says – "Love your neighbor as yourself."**

23.    Over the years the Company has been recognized and reported in articles by various online and other publications which explain the Christian faith-based mission of Christian Brothers as a franchisor and regarding its Christian franchisees. Examples include listings for multiple years on *Entrepreneur* magazine's ranking of the country's best franchising opportunities, ranked #2 on the *Forbes* "America's Best Franchises" list, and *FranchiseWire's* list of "9 Faith-Based Franchises That Put People and Values First."

### Brad Fink's Roles and Responsibilities with Franchisees

24.    Since 2007, I have held various roles within the Christian Brothers Automotive brand as an employee of a Christian Brothers Automotive store, a franchisee of Christian Brothers Automotive stores, and as an employee of the Christian Brothers Automotive Corporation Home Office. Because of my positions at Christian Brothers and my involvement in the franchisor's

annual and regional conferences and other interactions, I've personally met and gotten to know each of the more than 250 franchisee owners in the Christian Brothers family.

25.    I am currently the Chief Growth Officer for Christian Brothers Automotive Corporation, a role I have held since December 15, 2022. As the Chief Growth Officer, I am responsible for franchise development efforts, including the process of finding and qualifying prospective franchisees to own and operate Christian Brothers Automotive stores.  In my role, I am also responsible for leading training efforts at Christian Brothers.  Prior to being promoted to Chief Growth Officer, I was the Vice President of Training and Franchise Development, a role which I began in February of 2018.

26.    Prior to joining the Christian Brothers Automotive Corporate Home Office in 2018, I was both a Christian Brothers Automotive franchise owner and an employee of a Christian Brothers Automotive franchise.  I first began working under the Christian Brothers brand during the summer of 2007, when I was recruited to become a Service Adviser at the Christian Brothers Automotive Grand Parkway store, located in Katy, Texas (CBA Grand Parkway).

27.    In October 2008, I accepted an opportunity to become the Franchise Operator of CBA Grand Parkway, and in 2015 I was awarded ownership of the CBA Grand Parkway store as Franchisee. In December 2010, while Franchise Operator at CBA Grand Parkway, I was given the opportunity to open a new Christian Brothers Automotive store on Eldridge Parkway in Houston's Energy Corridor (CBA Eldridge) as the initial Franchisee of that location. In 2015, I sold CBA Eldridge and continued to own and operate CBA Grand Parkway until I joined the Christian Brothers Automotive Corporate Home Office in January 2018.

28.    I graduated from Arkansas Tech University in 2003 with a Bachelor of Science in Economics and Finance.  After my undergraduate studies, I attended one year of seminary school at George W. Truett Theological Seminary, which is located on the campus of Baylor University, from the fall of 2003 to spring of 2004.

29.    In my various roles under the Christian Brothers brand, I have become personally familiar with the 250 plus franchisee owners. This is in large part because my roles at the corporate home office have been primarily focused on selecting, supporting and training new and existing franchisees throughout the country. Prior to that, I personally knew a great many of them as fellow franchisees.

30.    As the Chief Growth Officer, I am also a member of the Company's Executive Leadership team, which is responsible for approving or rejecting prospects for franchise ownership. In 2020 when Plaintiff contacted Christian Brothers, the Executive Leadership team consisted of the nine-members of which I was one.

31.    In my role leading the Franchise Development team, I have direct knowledge and familiarity with the evaluation of prospective franchisees under the eight-step Discovery Process, the criteria and qualifications of franchisee candidates, and the decisions that are made with respect to offering franchise agreements to prospective franchisee owners.

Declaration of Brad Fink            DEFENDANT'S EXHIBIT A            5

32.    Over the course of years of building personal friendships and professional camaraderie and connection from countless professional and personal interactions with the franchisees, I have become aware of many of their personal and work lives, their biographies, families and their religious convictions and their commitment to their Christian faith.

### All Franchisees are Professing Christians

33.    Each and every one of the more than 250 current and former franchisees with whom I am personally familiar have unequivocally professed to be Christians.  I am aware of numerous instances in which Christian Brothers franchisees have exhibited a life consistent with their profession of faith, which often includes extensive participation in one's Church and with other religious organizations.

34.    I know from personal discussions I have had with franchisees and opportunities that I have had to hear them tell publicly or privately their personal spiritual life transformation of coming to Christianity through a personal relationship with Jesus Christ by faith. This includes discussions I have had with the franchisees about their spiritual walk as a Christian striving to follow Jesus and live a life that exemplifies his virtues and that involves obedience to the command to share our faith and the love of Christ with all whom we come in contact with when the opportunity presents itself. I have also seen evidence of spiritual transformation, growth, and conduct from our franchisees which is consistent with a person living as a committed Christian.

35.    Because of the nature of my position, I am familiar with the history and founding of the Company, including Christian Brothers' practice of only offering franchise agreements to persons who unequivocally profess to be Christians of like faith and who, from the best judgment of the executive team, exhibit a genuine spiritual relationship with Jesus Christ. As described further below, Christian Brothers has established processes for considering a prospect's religious beliefs and convictions.

### Christian Religious Faith is Required to be a Franchisee

36.    It is false and has never been true to state that a prospect's religious beliefs do not matter to the selection process of franchisees by the Company. A person is not qualified to own a Christian Brothers franchise if they are a non-Christian, or if they profess to be Christian but their religious beliefs or actions are not consistent with core Christian beliefs.

37.    No franchise agreement has ever been offered by the Company to any person who professed that they were not a Christian.  This is true regardless of whether they were Caucasian or any other race. Individuals who are not spiritually aligned with Christian Brothers' faith-based values cannot effectively carry out Christian Brothers' mission in their communities.

### All Races and Ethnicities are Eligible to be Franchisees

38.    The requirement of Christian faith to be offered a franchise agreement applies to all persons of all races and ethnicities who inquire about franchise ownership. This criterion exists

Declaration of Brad Fink          DEFENDANT'S EXHIBIT A                                 6

for religious and not racial reasons.  Race is not a consideration in connection with franchisee qualification.

39.    The Company's franchise agreements can be entered into with any qualified person of any race or ethnicity without preference or limitation, which is evident from the diverse racial makeup of the Company's franchisees, including individuals who are Hispanic, African American, Asian, and Middle Eastern.

## Purpose and Reason for the Christian Qualification

40.    There are legitimate reasons and purposes for requiring franchise owners to be Christians.  Since its inception in 1982, Christian Brothers has been founded upon Christian-based principles and pursued the faith-based mission of being a light in the communities in which it is located by spreading the message of Christianity and Jesus Christ to guests, employees, and community members when the opportunity presents itself in connection with providing automotive services.

41.    Christian faith is necessary to carry out the mission of sharing the Christian faith and living out the Christian faith in how the Company and its stores do business and interact with people. That cannot be done by someone who does not know Jesus Christ on a personal basis and who is not committed to following Christ in their daily life.

42.    If non-believers and other religious faiths were permitted to become franchise owners, the Christian mission would not be carried out at that location and the Christian faith-based culture that makes the Company's brand distinctive would be undermined and less effective. Based on my experience, one of the most common reasons that individuals provide for seeking to own a Christian Brothers franchise is the desire to live out their spiritual lives at work.

43.    In addition, the Christian camaraderie at national and regional franchise retreats and conferences, and spiritual fellowship and dedicated time for prayer among fellow franchisees throughout the Christian Brothers franchise family is a cornerstone for the Company's success in terms of brand cohesiveness and loyalty, low turnover of franchisees, no closed stores, commitment to growth and high satisfaction among franchise owners.

44.    Leaning on and supporting one another as brothers and sisters in Christ while committed to excellence in service and business is a critical distinguishing factor to the growth of the brand and number of franchised stores throughout the country. These reasons for requiring franchisees to be Christians are offered by franchisees in testimonials, some of which are on the Company's website as described above. See, e.g., Ex.B:04-14.

45.    Substantial corporate time, money and administrative effort has been invested by the Company to foster a uniquely welcoming and supportive Christian faith-based culture. Such a unique culture can only persist and thrive if the Company continues to attract and contract with persons of like faith who are fully committed to Christian principles and values.

46.    If forced by lawsuits, courts and other manner of government intrusion to contract for franchises with non-Christians or individuals of completely different religious faiths, the uniquely Christian culture at Christian Brothers would be forever altered and diminished as a distinctive experience for Christians to live out their faith in their business. Even the Company name would be misleading and no longer stand for the vision of the Company's founder to be brothers and sisters in Christ. The Company would lose a significant portion of its identity as a faith-based business, which is a competitive advantage distinguishing it from other franchise opportunities and which attracts prospective franchisees who specifically are looking for a faith-based business to own and appreciate Company's uniquely faith-based operations, branding and internal governance.

47.    For all these reasons, an offer of franchise ownership is only made after the Executive Leadership team is in agreement that a prospect's Christian faith appears sincere and aligned with the Company based on their testimony.

**Franchisees are Charged with Advancing the Company's Faith-Based Mission**

48.    In addition to other spiritual and religious activities mentioned in this Declaration, Franchisees are encouraged and expected to be lights for Christianity in their respective communities, including regularly engaging in the kinds of faith-based activities that come naturally to them and are appropriate to each individual franchisee's personality and style of sharing their faith and living out their Christian faith.

49.    In their stores and while carrying out their business activities, franchisee owners are expected to lead by example and are encouraged to live out their faith at work. Part of the Company's faith-based mission is to be scrupulously ethical, thoughtful, kind and helpful with customers to demonstrate the principle of "Love your neighbor as yourself."

50.    The leadership and character demonstrated by franchisees every day and how they do their work and handle problems and conflicts is often an expression of their Christian faith and can bring attention to the role of Jesus Christ in all aspects of life.  Bringing Christian values to the workplace is in itself vital to realizing the founder's original vision for each Christian Brothers franchise.

51.    As the owner and face of Christian Brothers Automotive in the community, the franchisee is uniquely positioned to exemplify Christian Brother's mission to guests and employees, who often are not Christians. Because there is no one of higher rank or responsibility at the store than the franchisee, their role is vital. It would not be possible to create the Christian Brothers faith-based work culture if the franchise owner were not a committed Christian, spiritually aligned, equipped by knowledge of Biblical principles and the faith.

52.    The franchisees also play a vital role in advancing the Christian Brothers' mission via community outreach in combination with Christian churches, faith-based non-profit organizations, and other social service ministries for charitable and evangelical reasons. Examples of this is the single mom's oil change program mentioned earlier (Ex.B:08), and efforts similar to

Declaration of Brad Fink        DEFENDANT'S EXHIBIT A                8

it which involve giving back to the local community in the name of Christ via time, expertise and funds.

53.     From first-hand knowledge I am aware that franchisees live out their Christianity and share their faith in word, deed and example in their local store and market in a wide variety of faith-based activities and strategies to advance the Company's religious mission. This involves, among other things, individual and group prayer, Bible study, discipleship and spiritual mentoring, evangelizing by sharing faith with others, sharing the Gospel, sharing their personal Christian conversion testimony, offering Bibles and religious instruction to others, and many other forms of involving themselves in the lives of the people around them for a greater spiritual purpose of loving neighbors, employees, customers and others as yourself.

### Determining if a Prospect Holds Genuine Christian Religious Convictions

54.     For all the reasons explained in this Declaration, the requirement to be a Christian to be qualified for an offer of a franchise agreement is not a perfunctory requirement. It is one that is taken very seriously because of its importance to the integrity of the Company's mission and its culture.

55.     A person cannot fulfill the requirement by simply saying they are a Christian. While the Executive Leadership team of course gives deference to the prospect's personal identification as a Christian and recognizes that no one can fully know the heart or spiritual sincerity of another person, there are many other indicators that can be considered when making a judgment as to spiritual alignment and a personal relationship with Jesus Christ.  For example, Christian Brothers' Testimonial Interview process (described below) was developed to explore a prospect's Christian faith and evaluate whether there is spiritual alignment.

56.     Judgments about a prospect's Christian beliefs are not the responsibility of the Franchise Development team members like Brandon Thomas, who handled Steps 1-5 of the Discovery Process for prospects generally, and Steps 1-3 for Plaintiff in particular. Rather Franchise Development team members are largely instructed to gather information from a candidate and provide information to them about the Company in keeping with Company guidelines.  It is solely the responsibility of the Voting Members of the Company's Discovery Day evaluation team to consider a person's profession of faith and form a judgment as to its sincerity after Step 6 of the Discovery Process.

### Christian Brothers Franchisees are Racially Diverse

57.     While the Company does not inquire about or maintain records on each franchisee's ethnicity, race or heritage, I am aware of racial diversity among franchisees based on my familiarity, personal relationships and personal interactions with the Company's franchisees. I am personally aware that the Christian Brothers system includes franchisees of Hispanic, African-American, Asian, Middle Eastern, and other racial and ethnic backgrounds.

**The Company has Executed Franchise Agreements
with Franchisees of Jewish Ethnicity**

58.     I am certain that at least two of our franchisees are of Jewish ethnicity or heritage because they volunteered this information about themselves to me.  I would expect there to be several other Christian Brothers franchisees who are Christians and have at least some Jewish ancestry or lineage.

59.     Josh Skalka is one franchisee who I know to be of Jewish ethnicity.  I met Josh in 2017 while he was employed as a Service Manager at CBA Missouri City.  I got to know Josh well while he was participating in an academy program at the Christian Brothers Corporate Home Office.  We became friends and often shared personal information about our lives and families. At the 2018 Christian Brothers Annual Convention, I had a joyful conversation with Josh and his wife in which he expressed to me that he had decided to follow Jesus Christ.  He also shared that he was of Jewish ancestry, and that he grew up religiously Jewish. When an opportunity became available for him, he realized his dream of owning a Christian Brothers franchise and as a converted Christian he carries out the Christian Brothers faith-based mission as a franchisee.

60.     In addition to Josh, I am aware that another franchisee, Micah Rose, is of Jewish ethnicity from information that he provided in connection with the Discovery Process, including his forms and bio and when he shared his testimony about his Christian faith. The Company was aware of his Jewish ethnicity before it offered and he accepted a franchise agreement.

61.     Provided he completed the Discovery Process and met all other franchisee qualifications, Plaintiff would have been treated similarly to the aforementioned franchisees of Jewish ethnicity if he had been a professing Christian as they are, rather than being a professing non-Christian.

**Christian Brothers Automotive
8 Step Discovery Process for Qualifying Franchisees**

62.     As the Chief Growth Officer of Christian Brothers and as its Vice President of Training & Franchise Development before, I lead the Franchise Development team, who are responsible for identifying prospective franchisees and leading them through the "Discovery Process," which is the process used to qualify prospects for Christian Brothers franchise ownership.

63.     The Franchise Development team consists of four members, not including myself. There is a Director of Franchise Development, two Franchise Development team members (which was the position held by Brandon Thomas), and one Franchise Development Coordinator. The Franchise Development team's job is to gather information about those making inquiries and provide information to them about Christian Brothers. Importantly, the Franchise Development team is not responsible for approving franchisees. The nine members of the Christian Brothers Executive Leadership team, plus three additional members of Christian Brothers senior management (collectively, "Voting Members"), are solely responsible for approving franchisees as described further below.

Declaration of Brad Fink                    DEFENDANT'S EXHIBIT A                    10

64.     The Discovery Process is an eight-step process for qualifying prospective franchisees. See generally Ex.B:17-18.  Prospective franchisees come to Christian Brothers in two primary ways: (1) organic leads (found Christian Brothers through their own interest) or (2) a referral from a member of the CBA family. Below is a brief overview of the Steps of the Discovery Process.

65.     Step 1 of the Discovery Process is an introductory call with one or more Franchise Development team members. Step 1 involves a high-level overview of Christian Brothers and the prospective franchisee's goals and background. The Franchise Development team provides the prospect with a single PDF document that outlines the eight step Discovery Process.  Typically, prior to this initial phone call the franchise candidate has researched the brand enough to know and understand that Christian Brothers is a Christian faith-based organization.

66.     Step 2 is a brand review. The prospective franchisee is provided with a slide deck that includes information about Christian Brothers, including material regarding the Christian faith-based mission of the company. Ex.B:25-35. The Franchise Development team member presents this material on a phone or video call and provides an opportunity for Q&A.

67.     At Step 3, the prospective franchisee is asked to complete a Request for Consideration (RFC) (Ex.B:37-40), which is the first time they share anything beyond basic contact information. The purpose of the Step 3 call is to go over the RFC and identify places where we need more information from the prospect. As discussed below, this is the stage at which Plaintiff's Discovery Process was incomplete and ended shortly after.

68.     Step 4 involves financial and territorial analysis.  The prospect is required to complete a Personal Financial Statement (PFS) (Ex.B:43-53). The Step 4 call involves initial discussion of the PFS, funding for the purchase of a franchisee, and high-level territorial analysis to discuss where possible new sites could be located and built.

69.     Step 5 is intended to review highlights of the Franchise Disclosure Document (FDD), which franchisors are required by law to complete, and answer questions from the prospect. The FDD is a document with more than 300 pages which serves as a comprehensive guide to the financial and other terms and conditions that apply to franchisees once they sign the franchise agreement. The FDD was not provided to Plaintiff because he was only in Steps 1 – 3 which is the screening phase. The Company is not required to provide the FDD to a prospect any earlier than the point when parties begin the sales process. However, even at Step 5, there is no offer on the table to purchase a franchise.  That cannot occur until after the Executive Leadership team votes and approves a candidate after Step 6.

70.     Step 6 is "Discovery Day."  If a prospect completes Steps 1 – 5 and remains in the Discovery Process, he or she is invited to spend time with the executive team over two days in Houston where Christian Brothers Headquarters is located. This includes social, informal and formal contexts to get to know the prospect personally and to assess the prospect's qualifications in all respects. At Discovery Day, prospects attend several breakout sessions and hear presentations about Christian Brothers' franchisee support, the franchisee-franchisor relationship, and the CBA

Declaration of Brad Fink                    DEFENDANT'S EXHIBIT A                         11

culture. Additionally, the candidates have in-depth meetings and interviews with the Executive Leadership team. The interview sessions include:

- <u>Testimonial Interview.</u> As stated further above, during the Testimonial Interview attendees are asked to share their personal journey with the Christian faith and participate in a role play simulating how they would convey the message of Jesus Christ in response to a request from a guest or team member.

- <u>Leadership Interview.</u>  This interview is conducted by a panel of various members of the Christian Brothers Executive Leadership team and explores past leadership experience and how that might project to future franchise ownership. Prospects must exemplify Servant Leadership consistent with the teachings of Jesus Christ.

- <u>Situational Interview.</u>  This interview explores a candidate's professional experience and background, and includes a situational role play scenario exemplifying what they may experience in a shop environment.

71.    Discovery Day (Step 6) is the first opportunity that the Christian Brothers Executive Leadership team has to personally evaluate a prospective franchisee.  Most of the information used by the Executive Leadership team to evaluate prospective franchisees is prepared and submitted by a prospect after Step 5, but before they attend Discovery Day (Step 6).  For example, in advance of Discovery Day, prospective franchisees are required to complete a candidate questionnaire form outlining their experiences and motivation for small business and franchise ownership, provide a current resume, submit to a background check, create a 10 to 15 minute video presentation outlining their qualifications, motivation, strengths, weaknesses, and business goals, and complete a behavioral and personality study (DISC and EQ). In addition, a prospective franchisee is required to participate in an in-store evaluation in which they spend a day at a Christian Brothers store with a franchisee in their home market or in a franchise location in Houston.

72.    No offer to purchase a franchise is made to prospects at Step 6.  Following Discovery Day, the Voting Members of Christian Brothers vote on whether the prospect should be offered the opportunity to purchase a Christian Brothers franchise. There is no path to automatic qualification without a vote by the Voting Members. To determine whether to proceed with a prospective franchisee, the Voting Members use a variety of criteria to evaluate a prospect, including spiritual alignment, leadership, business intelligence, grit, sales experience, financial qualifications, and coachability.

73.    <u>Step 7</u> is called final validation. It comes after Discovery Day and involves the prospect and the Company deciding if they mutually want to move forward in a franchise relationship.

74.    <u>Step 8</u> (assuming both parties agree to move forward) is the first time that the parties make any sort of legal commitment to one another.  An acknowledgement of receipt letter with a series of attachments in the form of Ex.B:79-84 is sent to the prospect. The letter expresses Christian Brothers's commitment to conduct a site search for a store location in a specific market and the intent of both parties to enter into a franchise agreement provided the prospect meets the

immediate conditions, including the payment of the applicable initial franchise fee (usually $85,000). Prior to the letter being executed, neither the Company nor the prospect have a contractual or other obligation to continue the Discovery Process or any transaction related to franchise ownership. The prospect or the Company can end the Discovery Process at any time for any reason or no reason.

75.    Often an actual Franchise Agreement is not executed by the parties until years after the conclusion of the Discovery Process. For a new location, the Franchise Agreement is not executed until construction commences for the store, which is typically 2 to 3 years after the conclusion of the Discovery Process.

76.    The table of contents of the franchise agreement in the form of Ex.B:73-78 is enclosed with the acknowledge of receipt letter. Ex.B:79-84. The franchise agreement will be signed later after the prospect's legal counsel has reviewed it and any legal or contractual issues are worked through by the Company's legal department and the franchisee's legal counsel and after the prospect is able to obtain financing, pay fees and timely satisfy various other terms and conditions in the letter.

**Race and Ethnicity is Not Part of the 8 Step Discovery Process**

77.    The key characteristics that the Company is looking for in a franchisee are highlighted in Ex.B:15-16. Christian faith of the person must be a central part of their lives such that the teachings of Jesus Christ guide them in their life.

78.    As the Chief Growth Officer, I oversee the Company's Franchise Development team members as they respond to inquiries about franchising with the Company. Brandon Thomas was one of the team members. I am familiar with the Company's eight step Discovery Process which is summarized above and on the Company's website as shown at Ex.B:17-18.

79.    As part of that oversight, the race or ethnicity of the prospects is not and never has been part of the criteria and would not be discussed when considering prospects because it is not part of the criteria to be a qualified franchisee. There was never a discussion to exclude persons because of their Jewish ethnicity or heritage.

80.    The Discovery Process has ended at Steps 3 and 4 for many prospects of all races and ethnicities for a wide variety of reasons, including but not limited a lack of spiritual alignment.

81.    Plaintiff was not the only person to have his Discovery Process ended. Over the years numerous prospects have had their Discovery Process ended under my direction as it becomes evident that they do not meet one or more of the franchisee criteria. Many prospects end the process on their own initiative because they decide franchise ownership does not meet their personal goals or because they realize they are not able to meet one or more of the franchisee qualifications.

82.    Because the Company mostly attracts the interest of professing Christians, the largest share of those who have had their Discovery Process ended for reasons other than faith

Declaration of Brad Fink                    DEFENDANT'S EXHIBIT A                    13

incompatibility would be those of the Christian faith who did not meet one or more of the other qualifications of franchise ownership. Christian prospects often have their Discovery Process ended due to a lack of leadership experience, insufficient financial resources, or one of the other criteria.

### Plaintiff's Inquiry and Discovery Process

83.     I am familiar with Plaintiff's Discovery Process. He was still in the early stages (Steps 1-3) of the screening process when his inquiry ended because he shared openly with Brandon Thomas that he was not a Christian but was of the Jewish faith. I testified in my deposition that Plaintiff seemed to come to his own conclusion that he may not be a good fit for the Christian Brothers brand because of a lack of spiritual alignment. Specifically, as Brandon Thomas testified in his deposition, Plaintiff informed Mr. Thomas that he was not a Christian and asked if that would be a problem. I validated that concern by making the decision to end Plaintiff's inquiry when Brandon Thomas, the Franchise Development team member assigned to Plaintiff's inquiry, brought the issue to me and sought guidance on how to respectfully discontinue the process since Plaintiff's Jewish religious beliefs were not aligned with the core Christian religious beliefs and faith-based mission of Christian Brothers.

84.     Plaintiff, like many organic inquirers, was not referred by someone to the Company and to Brandon Thomas. Only following a vehicle repair experience at one of our CBA locations in Austin did the Plaintiff contact us through the Company's website.

85.     Company records show the following contacts between Brandon Thomas and Plaintiff:

September 28, 2020:  Plaintiff's initial online inquiry was received, consisting of his name, email and phone number. Ex.B:22-23.

October 21, 2020     Step 1 call (one hour): introductory information exchanged. Brand Ex.B:24 – email sending Brand Review brochure to Plaintiff

October 27, 2020     Step 2 call (one hour): Discuss Brand Review brochure Ex.B:25-35

November 4, 2020     3rd call (less than 45 minutes)

November 17, 2020    4th call (2 minutes) Discovery Process ended.

86.     The fourth call was very short and did not cover the Step 4 topics. There were no calls or meetings for any other steps between Thomas and Plaintiff. Plaintiff did not get to Steps 4-8.

87.     At no point did I discuss Plaintiff's ethnicity with Brandon Thomas because ethnicity and race are not relevant to the evaluation of franchisee prospects. Plaintiff never told me that he was of Jewish ethnicity or race. As far as I am aware, he never told Mr. Thomas that he was of Jewish ethnicity or race either as that was not reported to me. When I made the decision to

Declaration of Brad Fink                DEFENDANT'S EXHIBIT A                                 14

end Plaintiff's inquiry I only knew Plaintiff was of Jewish faith. I did not know he was of Jewish ethnicity or race.

88.    I do not assume that a person professing Jewish faith is also of Jewish ethnicity because I have known individuals who are not of Jewish ethnicity and who chose to convert to the Jewish faith.

89.    Only after Plaintiff filed his lawsuit and testified at his deposition did I first learn that Plaintiff was ethnically Jewish through his ethnically Jewish mother, and that his father was not ethnically Jewish but was not Christian because he converted to the Jewish faith.

90.    I would have made the same decision to end Plaintiff's Discovery Process if he known to me as white or of any race or ethnicity upon learning that he is not a Christian. I would make that decision every time because if a person is of a faith other than Christianity, he or she is not aligned spiritually and religiously with the Company's Christian faith-based mission. Such a person also would not meet a key characteristic of what the Company is looking for in a franchisee by lacking Christian faith.

91.    My decision to end Plaintiff's Discovery Process was solely based on religion and not based on race or ethnicity. I have made the same decision in other similarly situated instances with prospects of other races and ethnicities including but not limited to white or Caucasian prospects who were not Christians or were of religious faiths other than the Christian or Jewish faiths.

**Plaintiff Was Not Qualified for Franchisee Ownership**

92.    Plaintiff, and any prospect at Steps 3 or 4, is not considered "qualified" for franchise ownership regardless of the characteristics they may believe they have. As stated above, the Voting Members (the Executive Leadership plus three additional senior managers) must vote in the affirmative to offer a franchise agreement to the prospect. The Franchise Development team did not consider whether to invite Plaintiff to Discovery Day because he did not complete Steps 1-5; rather his inquiry ended after Step 3.

93.    Because Plaintiff's inquiry ended at Step 3 of the Discovery Process, he never completed or submitted most of the information and materials used to evaluate prospective franchisees. For example, he did not provide a resume, complete a candidate questionnaire, complete the required personality and behavioral study, participate in an in-store interview, or prepare a video presentation or live presentation for Discovery Day.

94.    Because Plaintiff's Discovery Process ended at Step 3 no evaluation materials were ever provided to the Executive Leadership team. Nor had the Executive Leadership team received or reviewed a Step 3 request for consideration form completed by Plaintiff (Ex.B:37-40), or received or reviewed a Step 4 financial statement completed by Plaintiff received or reviewed a signed and completed Step 4 background check authorization form from Plaintiff (Ex.B:46-53), and never performed a Step 4 background check on him. Plaintiff did not reach the later steps in

the Discovery Process when those forms would have been provided to the Executive Leadership team for review.

95.     Based on the information available to me in discovery in this case, I have seen no evidence that Plaintiff would have been qualified to be a Christian Brothers franchisee based on the established criteria used by the Executive Leadership team to evaluate prospects.  To highlight just one area, in addition to a lack of spiritual alignment, Plaintiff lacks the professional leadership experience necessary to lead a team at a Christian Brothers Automotive store.  To my knowledge, Plaintiff lacks any experience leading a team according to servant leadership principles, and has no experience hiring and firing employees.

96.     Plaintiff never requested, was never offered, and never committed to any specific site or location for a Christian Brothers store. There was no territory analysis or calculation of funding, which is required to move to the next step which is covered in Step 4.  Plaintiff did not take part in Step 4 because his Discovery Process ended prior to Step 4. Plaintiff and Thomas did not cover the topics specified for a Step 4 call as required by the Manual as discussed later in this Declaration.

97.     Additionally, Plaintiff had not been provided a copy of the FDD or the Franchise Agreement, outlining key information like the terms of the agreement between Christian Brothers and its franchisees, store financial performance, fees, and associated costs.

98.     At no time did Christian Brothers make or offer a contract to Plaintiff such that he could buy or that Defendant could sell a franchise. There was no discussion whether a franchise would be available to buy or if there even was one available. The parties had not gotten that far as they were still in the information exchange and screening stage in Steps 1-3. Therefore, no location was selected, no start date, price, financing, leasing or any of the other terms and conditions were discussed related to purchasing a franchise. Plaintiff was not informed of any of the terms in the franchise agreement. Not the price, term, ongoing fees, location or other terms and conditions.

99.     Additionally, there were no available franchises to offer to Plaintiff in his geographic area (the Austin area) at the time when Plaintiff made his inquiry and for at least a year or more after that.

100.     This is confirmed by Ex.B:18 which is a screenshot of the drop down notice that would populate online if a person typed in an inquiry in the websites "Territory Available" box. At that time if a location in Texas was selected, the user would receive the following message: "TEXAS: Thank you for your interest in this area. Unfortunately, we have limited availability in this territory."

101.     A white non-Christian was not offered a franchise agreement or store in Plaintiff's geographic area.

102.     Sometimes the Company has an existing store available for ownership, in which case a franchisee could pay the franchise fees, sign the franchise agreement and begin ownership relatively quickly. No such location was available during Plaintiff's Discovery Process.

Declaration of Brad Fink          DEFENDANT'S EXHIBIT A                    16

103.    When no existing store is available, it will usually take 18 to 24 months or even longer before one can be located, purchased, built and made ready for the franchisee to occupy, as explained on the Company's website at Ex.B:19-20.

### Thomas Was Not a Decisionmaker,
### His Calls Followed Guidance in the Recruiter Manual

104.    Brandon Thomas in his role as a Franchise Development team member was not authorized to decide, and did not decide, if a prospect's Discovery Process would be ended early, who is selected to become a franchisee, to change policy or procedure, or to change over forty years of precedent of requiring Christian faith as a qualification for franchise ownership. Such matters are outside his role as a franchise development team member, which was limited to performing the screening functions within the Discovery Process as outlined in the Manual.

105.    When Brandon Thomas received Plaintiff's online inquiry in September 2020, he was recently transferred to his franchise development team member position just a few months earlier. He was trained to implement the Discovery Process by handling each of Steps 1 – 5 according to the guidance provided to "Franchise Recruiters" as his position is called in the "ROS Recruiter Manual" ("Manual") used by the Company in 2020. Excerpts of which are attached starting at Ex.B:54-72.

106.    The Manual describes the Franchise Recruiter's responsibilities as establishing rapport with the prospect by assuming the role of an interviewer/coach during the three phone calls in Steps 1 -3. Ex.B:55-56. Each call is designed to last no longer than one hour. This is described as the vision phase because Steps 1-3 are designed to inspire the prospect to imagine themselves in a new role as a franchise owner in the franchise system while also screening for the key characteristics to see if the executive team might consider the prospect as a lead for serious consideration in Steps 6-8. Ex.B:58.

107.    The first call is focused on finding out who the prospect is and what they are looking to accomplish, and to explain about how the Company does business. Ex.B:59-60. The Manual provides specific guidance on how to close the first call by saying **"This is Step 1. Either of us making a decision on you as a Franchisee comes much, much later in the process…"** Ex.B:61.

108.    The Step 2 call focuses on the Brand Review content shown in Ex.B:25-35 which informs the prospect of what the Company provides to its franchisees. Brandon Thomas was specifically instructed in the Manual that "Best Practices" include **"Never 'close the file' until after Step 3."** Ex.B:62-63.

109.    The Manual describes the Step 3 call as "the first time the candidate is sharing more personal information, such as assets, liabilities, and income." Ex.B:64. This step is also the first time the candidate is sharing information about their current work and work history.

110.    The Manual describes the Franchise Recruiter's role as a facilitator in Steps 4-5 in obtaining funding, FDD review and preparation for Step 6 if the prospect is invited by the

executive team to Discovery Day at the corporate home office. The Manual informs the Franchise Recruiter that "Step 4 is complete once the final dollar amount needed to fund the investment is determined and the funding channel(s) are secured." Ex.B:66-67.

111.    The amount is determined by adding the initial fees, required business working capital and the candidate's required personal living expenses during the start-up of the franchise." Ex.B:67. None of that was discussed or worked on in Plaintiff's case because he never got to Step 4. The Manual advises that the final dollar amount and source of funding must be determined before Step 6 (Discovery Day)" which "generally takes 2-3 weeks." As the Manual shows, Plaintiff was not even close to being ready for an invitation to Discovery Day, much less considered qualified in all respects.

112.    Step 5 is described as a walk-through of the FDD to inform the prospect of the many obligations, fees and requirements that are disclosed and were not discussed in the prior calls. Ex.B:68. It is at this point that specific terms and conditions are made known to the prospect. This illustrates how few "deal points" were even known to Plaintiff, as his less than three hours of interaction was focused on the "vision" calls in Steps 1-3.

113.    The Manual describes the Franchise Recruiter's role in Steps 7 and 8 as one of offering support until the franchise agreement is signed. Ex.B:69-72. The Franchise Recruiter has a minimal role in the contracting stage. The Manual explains that at Step 7 the prospect is addressing final details related to "funding, timeline, franchise agreement review, territory/marketing area, training dates, payment of initial fees, legal document review, attorney review, travel for training plans, leaving employment and broker calls. Ex.B:72.

### Less Than 2% of Those Who Submit
### a Franchise Inquiry Enter Into a Franchisee Agreement

114.    At my direction, the Company maintains data on franchisee inquiries and outcomes as the franchise development team works through the Discovery Process with each inquiry. The following is true and correct data I compiled in the ordinary course of business from the Company's business records:

<u>2019:</u>    1223    **total "leads" (online inquiries received)**
         47    "Step 6" (completed discovery day - executive team)     (3.8% of leads)
         29    "Step 7" discovery day attendees approved by executive team    (2.4% of leads)
         **21**    **"Step 8" approved candidates contracted with Company**     (1.7% of leads)
              (paid initial fee or acquired existing business)

<u>2020:</u>    1289    **total "leads" (online inquiries received)**
         41    "Step 6" completed discovery day - executive team)     (3.2% of leads)
         28    "Step 7" discovery day attendees approved by executive team    (2.1% of leads)
         **24**    **"Step 8" approved candidates contracted with Company**    (1.86% of leads)
              (paid initial fee or acquired existing business)

| **2021:** | **1242** | **total "leads" (online inquiries received)** | |
| | 36 | "Step 6" completed discovery day - executive team) | (2.9% of leads) |
| | 26 | "Step 7" approved by executive team | (2% of leads) |
| | **22** | **"Step 8" approved candidates contracted with Company** | (1.77% of leads) |
| | | (paid initial fee or acquired existing business) | |

| **2019 – 2021 total:** | 3,754 total inquiries over 3 yrs. | (avg. 1251 leads/year) |
| | **67 completed "Step 8"** | **(avg. 22 new franchisee contracts/year)** |
| | | (avg 1.78% leads/year become franchisees) |

115.     Thus, the Company's data shows Plaintiff had less than a 2% likelihood of his 2020 inquiry ending in a franchisee agreement with Defendant. Plaintiff was 1 of 1,289 leads in 2020. Of those leads, only 24 were approved by the Voting Members, paid an initial franchise fee and signed a franchise agreement as required to acquire an actual contractual interest related to a franchise.

Declaration of Brad Fink          DEFENDANT'S EXHIBIT A                    19

"I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief and that this Declaration is signed by me on September 16, 2024."

_____
Declarant's Signature