United States Courts
Southern District of Texas
FILED
*October 21, 2026*
Nathan Ochsner, Clerk of Court

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
September 30, 2026
Lyle W. Cayce
Clerk

No. 25-20486

EVAN DOMANIC,

*Plaintiff—Appellant*,

*versus*

CHRISTIAN BROTHERS AUTOMOTIVE CORPORATION,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-386

Before DUNCAN, OLDHAM, and WILSON, *Circuit Judges*.

STUART KYLE DUNCAN, *Circuit Judge*:

Christian Brothers Automotive Corporation is a faith-based auto-repair business that franchises only to Christians. All of its more than 250 franchisees—a group which includes some ethnic Jews—are professing Christians. When the company refused to franchise to Evan Domanic, who is an ethnic and religious Jew, Domanic sued for racial discrimination under 42 U.S.C. § 1981. The district court granted Christian Brothers summary judgment, ruling that its franchise policy constituted not racial but religious discrimination, which is not cognizable under § 1981.

On appeal, Domanic's main argument is that discrimination against Jews is *ipso facto* racial discrimination, even when (as here) the differential treatment is motivated purely by religion and not ancestry. We decline to adopt this novel argument, which is in tension with the Supreme Court's longstanding precedent that § 1981 does not reach religious discrimination. The argument is also out of step with the Seventh Circuit, which has twice rejected similar contentions about the indivisibility of Jewish ethnicity and faith under § 1981.

Finally, we also agree with the district court that no evidence suggests that Christian Brothers's franchise policy is a façade for ethnic discrimination against Jews. If there were any evidence of that, of course, then Domanic's § 1981 claim would have to go to a jury. Because there is no such evidence, however, the district court correctly granted summary judgment dismissing Domanic's § 1981 claim. We therefore AFFIRM.

# I

Christian Brothers describes itself as a "faith-based franchisor of auto-repair stores," whose mission is to "glorify God by providing ethical and excellent service to its customers." This ethos is reflected in the company's branding, website, mission statement, and, of course, its name.

Christian Brothers franchises only to professing Christians. The company asserts that, in forty years of business, it has never offered a franchise to someone not "spiritually aligned with the company and prepared to share a personal Christian testimony." As a result, each of Christian Brothers's more than 250 franchisees professes the Christian faith. It is undisputed that this group encompasses a variety of races and ethnicities and includes at least two ethnic Jews.

Domanic, who is both ethnically and religiously Jewish, applied to open a Christian Brothers franchise in the fall of 2020.[1] During the ensuing process, Christian Brothers employee Brandon Thomas asked Domanic about his faith. He replied that he is Jewish, not Christian. Domanic alleges Thomas told him religion would not be an issue, something Christian Brothers denies.

In November 2020, Domanic made it to the third of eight steps in the process, the step when candidates share "more personal information." At this point, Thomas called Domanic to tell him that Christian Brothers was ending the process because Domanic is Jewish.

In 2022, Domanic sued Christian Brothers in federal district court, claiming racial discrimination under 42 U.S.C. § 1981. Specifically, he alleged Christian Brothers denied him a franchise because of his Jewish ethnicity and not his Jewish faith—or that, in any case, there is no meaningful distinction between Jewish ethnicity and religion, regardless of what actually motivated the company's refusal. Christian Brothers moved to dismiss, arguing that it ended the franchise process based solely on Domanic's non-Christian faith and not his Jewish ethnicity, of which it was unaware. The district court denied the motion, finding Domanic had adequately pled a claim for racial (as opposed to religious) discrimination.

Christian Brothers subsequently moved for summary judgment. Among other things, it argued that Domanic's claim was "a religious discrimination claim masquerading as race discrimination"; that Domanic had failed to make out a *prima facie* case of race discrimination; and that, in

---

[1] Domanic was one of more than 1,200 applicants in 2020, only twenty-four of whom were ultimately awarded a franchise.

any event, the company's franchise policy provided a lawful, race-neutral, and non-pretextual reason for denying Domanic a franchise.

The district court granted Christian Brothers summary judgment. Applying the *McDonnell Douglas* framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the court held that—while Domanic had established a prima facie case of race discrimination under § 1981—Christian Brothers showed that its religious franchise policy was a legitimate, race-neutral justification for its actions and that there was no evidence this justification was pretextual.

Domanic now appeals.

## II

We review summary judgments *de novo*, applying the same standards as the district court. *Students for Fair Admissions, Inc. v. Univ. of Tex.*, 37 F.4th 1078, 1083 (5th Cir. 2022); FED. R. CIV. P. 56(a).

## III

On appeal, Domanic argues the district court erred in granting summary judgment dismissing his § 1981 race discrimination claim. Below, we (A) explain that § 1981 forbids racial (but not religious) discrimination in contracting, and then (B) assess the district court's conclusion that Domanic presented no evidence that Christian Brothers discriminated on the basis of his Jewish ancestry.[2]

---

[2] Alternatively, Christian Brothers defends the district court's judgment on the ground that its franchise policy is insulated by the First Amendment's protections for the autonomy of religious organizations. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 181 (2012); *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 157 F.4th 627, 635–41 (5th Cir. 2025), *cert. denied*, 146 S. Ct. 1674 (2026). Church autonomy doctrines like the ministerial exception are "immunities from suit that must be resolved at the earliest conceivable point in litigation" when they are

### A

Section 1981 provides in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . .

42 U.S.C. § 1981(a). The section applies to both government and private actions. *See id.* § 1981(c) ("The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.").

While § 1981 does not use the term "race," the section has long been understood to "prohibit[] racial discrimination in the making and enforcement of private contracts." *Runyon v. McCrary*, 427 U.S. 160, 168–69 (1976) (collecting authorities). Section 1981's conception of race is broad: it protects "identifiable classes of persons who are subjected to intentional discrimination solely because of their *ancestry or ethnic characteristics*." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (emphasis added). It does not matter that, today, some ethnic or ancestral group (say, Germans or Swedes) might be considered "white" or "Caucasian." *See id.* at 612. The focus is instead on what groups Congress intended to protect when it enacted the law in 1870. *See id.* at 610 ("The understanding of 'race' in the 19th century . . . was different. Plainly, all those who might be deemed Caucasian today were not thought to be of the same race at the time § 1981 became law.").

---

implicated. *McRaney*, 157 F.4th at 644. That is because "the very process of inquiry" into a religious entity's internal affairs by a civil court violates the First Amendment. *NLRB v. Cath. Bishop of Chi.*, 440 US. 490, 502 (1979). The record, however, is not sufficiently developed for us to decide how the religious autonomy doctrines might apply to Christian Brothers's business. Accordingly, we decline to address the question.

It is also settled that § 1981 forbids discrimination on the basis of Jewish ethnicity or ancestry. In *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987), the Supreme Court confirmed that, at the time § 1981 (and its companion, § 1982) were enacted, "Jews constituted a group of people that Congress intended to protect." *Id.* at 617. "Jews and Arabs," the Court explained, "were among the peoples then considered to be distinct races and hence within the protection of the statute." *Id.* at 617–18. It is immaterial that Jews may be commonly classed as racially or ethnically "white" today. *See id.* at 618; *Lubavitch-Chabad of Ill., Inc. v. Nw. Univ.*, 772 F.3d 443, 446 (7th Cir. 2014). A person of Jewish ancestry can nonetheless sue under § 1981 if he is discriminated against on the basis of that ancestry.

Finally, it is equally settled that § 1981 does not forbid religious discrimination. *See Runyon*, 427 U.S. at 167 (observing that "§ 1981 is in no way addressed to . . . categories of selectivity" such as "the right of a private school to limit its student body to . . . adherents of a particular religious faith"). Our court has confirmed that § 1981 does not reach claims of religious discrimination. *See, e.g.*, *Sibley v. Touro LCMC Health*, No. 24-30189, 2024 WL 5118489, at *4 (5th Cir. Dec. 16, 2024) ("§ 1981 'does not protect against religious discrimination.'" (quoting *McCoy v. Homestead Studio Suites Hotels*, 177 F. App'x 442, 445 n.2 (5th Cir. 2006))). So have our sister circuits. *See, e.g.*, *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) ("It is . . . settled that Section 1981 does not prohibit discrimination on the basis of . . . religion . . . ."); *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 908 (9th Cir. 1999) ("To establish a claim under § 1981 the plaintiff must prove that he or she was subjected to intentional discrimination based upon his or her race, rather than solely on the basis of . . . their religion.").

### B

As noted, the district court applied the *McDonnell Douglas* framework and found at step one that Domanic made out a *prima facie* case of racial discrimination.[3] Nonetheless, the court ruled that Domanic's § 1981 claim failed at steps two and three. Specifically, it found that Christian Brothers demonstrated "a legitimate, non-discriminatory reason" for refusing to contract with Domanic—namely, its Christian-only franchise policy—and also that Domanic failed to show this policy was a pretext for racial discrimination. *See Hager*, 102 F.4th at 699–700.

Domanic makes no serious effort on appeal to show any error in the district court's ruling. That is unsurprising. As discussed, the evidence proved without contradiction that Christian Brothers has a longstanding and consistent policy of franchising only to professing Christians. And no evidence suggested that this policy was a pretext for racial discrimination against persons of Jewish ancestry (or any other ancestry). To the contrary, the undisputed evidence showed that Christian Brothers has franchised to two ethnic Jews who are professing Christians.

Domanic does make the novel argument that, as far as § 1981 is concerned, there can be no distinction between discrimination based on Jewish ancestry and discrimination based on Jewish faith. Section 1981, he contends, "protect[s] Jews . . . regardless of whether they are religious or ethnic Jews." The district court correctly rejected this argument.

---

[3] Specifically, the court found that Domanic satisfied his "minimal initial burden," *see Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012) (quotation omitted), of showing (1) that he is a member of a racial minority; (2) that Christian Brothers had the intent to discriminate on the basis of race; and (3) that the discrimination limited Domanic's ability to enter into a franchise contract. *Hager v. Brinker Tex., Inc.*, 102 F.4th 692, 700 (5th Cir. 2024).

To begin with, accepting Domanic's argument would vitiate the established principle that § 1981 does not touch religious discrimination. *See Runyon*, 427 U.S. at 167; *Saint Francis Coll.*, 481 U.S. at 613. If Christian Brothers's policy were challenged under § 1981 by members of any other faith, those claims would fail as a matter of law. *See, e.g.*, *Saint Francis Coll.*, 481 U.S. at 613 (religious discrimination claim brought by Muslim not cognizable under § 1981). Yet Domanic asks us to recognize an exception for one faith only—Judaism. The settled law of § 1981 bars us from doing so.

Next, the weight of precedent leans decisively against Domanic's argument. Put to one side the precedent just discussed that § 1981 does not touch religious discrimination. Domanic cites only two district court decisions arguably supporting the proposition that discrimination against Jews—regardless of whether it is based on religion or ancestry—is *ipso facto* forbidden by § 1981.[4] To the extent those decisions stand for the proposition that purely religious discrimination against Jews (or any other faith) is cognizable under § 1981, they are mistaken and we decline to follow them.

More persuasive are two Seventh Circuit decisions directly addressing this question. In the first, *Bachman v. St. Monica's Congregation*, 902 F.2d 1259 (7th Cir. 1990), a Jewish couple sued a Catholic parish, claiming it discriminated by selling a house to a Catholic couple instead of them. *Id.* at 1260. The Seventh Circuit ruled this alleged religious discrimination was not cognizable under either § 1981 or § 1982. "Those statutes," the court explained, "forbid unequal treatment based on *race*, and

[4] *See Singer v. Denv. Sch. Dist. No. 1*, 959 F. Supp. 1325, 1327, 1330–31 (D. Colo. 1997) (ruling that alleged discrimination against an ethnically Mexican convert to Orthodox Judaism was forbidden as racial discrimination under § 1981); *Kirshner v. First Data Corp.*, No. 3:98-CV-0222, 2000 WL 1772759, at *1 n.4 (N.D. Tex. Nov. 30, 2000) (opining that "[r]eligious discrimination against a Catholic does not implicate § 1981; religious discrimination against a Jew does").

while for this purpose Jews constitute a race, it is not the case that every preference based on religion is a discrimination against a race." *Id.* at 1261. The court therefore held the jury was properly instructed that, even if the church "g[ave] a preference to Catholics" in the sale (something the church denied), "this did not alone constitute discrimination against the Jewish race ('ancestral discrimination'—not religious discrimination)." *Id.* at 1261–62.

In the second case, *Lubavitch-Chabad of Illinois, Inc.*, 772 F.3d 443, Northwestern terminated its affiliation with a Hasidic Jewish campus group, Chabad, after complaints about minors being served alcohol at the group's gatherings. *Id.* at 444–45. Chabad sued under federal antidiscrimination statutes, including § 1981, alleging its termination was really due to antisemitism. *Id.* at 446.

The Seventh Circuit distinguished discrimination against Jewish ancestry, which is covered by § 1981, from religious discrimination against Jews or Jewish groups, which is not. *Id.* at 446–47. As the court pointed out, Chabad did not even allege its disaffiliation arose from "hostility to ethnic Jews" (which would have been "hardly . . . plausible," given the large numbers of Jewish students, faculty, and administrators at Northwestern, including its president). *Id.* at 446. Rather, Chabad suggested the disaffiliation was motivated by "hostility to the Chabad sect"—which, the court noted, was a losing argument: "For there is no mention of religious discrimination in section 1981 . . . ." *Ibid.*

These sister circuit decisions show why Domanic's § 1981 claim fails. Both readily distinguished discrimination based on Jewish ancestry or ethnicity (which is forbidden by § 1981) from discrimination based on Jewish religion (which § 1981 does not address). In our case, all the evidence points to this being an instance of *religious* and not *ethnic* discrimination: Christian Brothers franchises only to professing Christians and, indeed, its franchisees

include ethnic Jews who meet that religious qualification. No evidence whatsoever suggests Christian Brothers, behind the façade of a religious policy, is in reality engaging in covert antisemitism. If any evidence suggested otherwise, Domanic's § 1981 claim would have to go to the jury.

None does, though. Accordingly, the district court correctly granted summary judgment dismissing Domanic's § 1981 claim.

## IV

The district court's judgment is AFFIRMED.

ANDREW S. OLDHAM, *Circuit Judge*, concurring in the judgment:

I agree with my esteemed colleagues' bottom-line conclusion that Christian Brothers is entitled to summary judgment. I write separately to make two points. First, we are required to reach the ministerial exception at the outset. And second, I remain dubious of our circuit's interpretation of *McDonnell Douglas*.

## I

Church autonomy doctrines like the ministerial exception represent "immunities from suit." *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 157 F.4th 627, 644 (5th Cir. 2025). They work to spare religious institutions from "the very process of inquiry" into their internal affairs. *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979). As the Supreme Court has explained, the First Amendment "prohibits government involvement in . . . ecclesiastical decisions," makes it "impermissible" for a court to "contradict a church's determination of who can act as its ministers," and otherwise "bars" covered suits. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189, 185, 196 (2012). An invocation of the church autonomy doctrines "must be resolved at the earliest conceivable point in litigation." *McRaney*, 157 F.4th at 644.

Courts undertake a holistic inquiry to determine whether an employee is a "minister" for church autonomy purposes. *Hosanna-Tabor*, 565 U.S. at 190–93. "Not all pre-*Hosanna-Tabor* decisions applying the exception involved 'ministers' or even members of the clergy." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020). Thus, it is irrelevant whether a party calls or does not call the relevant employee a "minister":

> If titles were all-important, courts would have to decide which titles count and which do not, and it is hard to see how that could be done without looking behind the titles to what the

> positions actually entail. Moreover, attaching too much significance to titles would risk privileging religious traditions with formal organizational structures over those that are less formal.

*Id.* at 753. "What matters, at bottom, is what an employee does." *Ibid.* Thus, the *Hosanna-Tabor* exception extends to "any 'employee' who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or *serves as a messenger or teacher of its faith.*" *Hosanna-Tabor*, 565 U.S. at 199 (ALITO, J., concurring) (emphasis added); *see also Our Lady of Guadalupe*, 591 U.S. at 754 (adopting this statement).

The problem, on this record, is that it is unclear what the Christian Brothers' franchisees do. If they serve as messengers or teachers of Christian Brothers' faith, then they could qualify for the ministerial exception. But my esteemed colleagues are quite right that we do not have the information necessary to make that determination at this stage. Given our obligation to decide the question at the outset anyway, *see McRaney*, 157 F.4th at 644, we must deny Christian Brothers' invocation of the *Hosanna-Tabor* exception without prejudice to the company's right to raise it later. *Cf. ante*, at 4 n.2. And as it turns out, there will be no later because the company wins at summary judgment on other grounds.

## II

On the merits, I remain perplexed by how or why *McDonnell Douglas* is relevant to disputes like this one. The majority and the district court both faithfully followed circuit precedent by applying the *McDonnell Douglas* test to Domanic's § 1981 claims. *See Crawford v. W. Elec. Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980); *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 823–27 (5th Cir. 2022) (at summary judgment). But that circuit precedent is troubling—both (A) generally and (B) in § 1981 suits specifically.

A

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court set out a three-part, burden-shifting framework for assessing employment discrimination claims under Title VII. This test was judicially created "out of whole cloth" and has "no basis in the text of Title VII or any other source of law." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 320 (2025) (THOMAS, J., concurring) (quotation omitted). So perhaps the Supreme Court should discard *McDonnell Douglas* wholesale.

In the meantime, it makes little sense to apply the test at summary judgment, because it conflicts with Federal Rule of Civil Procedure 56. I have already written about this problem. *See Green v. HCTec Partners, L.L.C.*, No. 24-20554, 2026 WL 839112, at *6–7 (5th Cir. Mar. 26, 2026) (OLDHAM, J., concurring in the judgment). In short, Rule 56(a) requires a court to grant summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). But *McDonnell Douglas* requires plaintiffs to prove *prima facie* discrimination by a preponderance of the evidence. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981). Rule 56(a) contains no such requirement, so it's tough or impossible to square *McDonnell Douglas* with Rule 56(a). *Ames*, 605 U.S. at 322–23 (THOMAS, J., concurring).

B

If applying *McDonnell Douglas* at summary judgment is strange, applying it to a § 1981 claim is even stranger. Why would a judge-made doctrine—a "product of Title VII practice"—created in the 1970s to assess employment discrimination claims apply to an 1866 statute that eliminates racial discrimination in contracts? *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 340 (2020).

Unclear. Title VII and § 1981 have entirely distinct texts, histories, common law backgrounds, and purposes. For starters, Title VII and § 1981 have different causation standards: Title VII requires showing protected-characteristic discrimination was a "motivating factor" to recover damages for an adverse employment action, while § 1981 requires showing race discrimination was a "but-for" cause of the plaintiff's injuries. 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B); *Comcast*, 589 U.S. at 333. These different causation standards require different proof frameworks.

Further, consider the laws' disparate purposes. Title VII remedies employment discrimination, and the *McDonnell Douglas* test is plainly tethered to this purpose. To prove *prima facie* employment discrimination, *McDonnell Douglas* requires a plaintiff to show that (i) he is a racial minority; (ii) he applied to an open job for which he was qualified; (iii) he was rejected; and (iv) the employer continued to seek similarly qualified applicants. 411 U.S. at 802.

These factors don't map cleanly onto non-employment-related § 1981 claims. Courts facing such claims have recognized this mismatch and changed the *McDonnell Douglas* test to make it fit the cases before them. *See, e.g.*, *T & S Serv. Assocs., Inc. v. Crenson*, 666 F.2d 722, 723–25 (1st Cir. 1981) (public bidding) (noting that "[t]he elements of a prima facie case of discrimination in the context of a public bidding decision necessarily differ" from the traditional *McDonnell Douglas* factors and requiring the bidder to show its bid was "*significantly* more advantageous" than the awarded bid "in terms of price or some other relevant factor" (emphasis added)); *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 867–73 (6th Cir. 2001) (retail purchasing contract) (requiring plaintiff to show either deprivation of services available to those outside the protected class or receipt of service in a "markedly hostile manner" which "a reasonable person would find objectively discriminatory" to make out a *prima facie* case); *Anderson v.*

*Wachovia Mortg. Corp.*, 621 F.3d 261, 271–76 (3d. Cir. 2010) (lending contract) (requiring "some additional evidence" establishing a causal nexus between "the harm suffered and the plaintiff's membership in a protected class" from which intentional discrimination could be inferred to make out a *prima facie* case).

This mismatch between *McDonnell Douglas* and § 1981 creates two related problems. *First*, it encourages courts to take a made-up test with "no basis in . . . any . . . source of law," *Ames*, 605 U.S. at 320 (THOMAS, J., concurring), and add new made-up factors that similarly have no basis in any source of law. No positive law requires a § 1981 plaintiff to prove, by a preponderance of evidence at a preliminary stage, that his bid was "significantly more advantageous" than his competitor's or that he received service in a "markedly hostile manner" which "a reasonable person would find objectively discriminatory." Courts simply invented these elements. *Second*, *McDonnell Douglas* shifts focus away from the actual requirements of § 1981. Section 1981 only requires a plaintiff to show race discrimination in contracting was a but-for cause of his injury. *Comcast*, 589 U.S. at 333. We should not push *McDonnell Douglas*'s square peg into § 1981's round hole.

* * *

Supreme Court precedent does not require us to apply *McDonnell Douglas* at summary judgment. *See Ames*, 605 U.S. at 326 (THOMAS, J., concurring); *id.* at 308 n. 2 (majority opinion) ("[W]e assume without deciding that the *McDonnell Douglas* framework applies at the summary-judgment stage."). And it doesn't require us to apply it to § 1981 claims. *See Comcast*, 589 U.S. at 340 (questioning *McDonnell Douglas*'s applicability to § 1981 claims); *McKenzie-El v. Am. Sugar Refin., Inc.*, No. 21-1089, 2021 WL 5412341, at *2 (4th Cir. Nov. 19, 2021) (per curiam) ("[I]n *Comcast* . . . the Supreme Court clarified that *McDonnell Douglas* does not address the

causation standard relevant for § 1981 racial-discrimination claims."). In an appropriate case, our en banc court should reconsider our use of *McDonnell Douglas* at summary judgment generally and in § 1981 cases specifically.